FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y
★ JUL 31 2009 ★
BROOKLYN OFFICE

ORIGINAL

D&F
C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BEJAZE DURAKOVIC,

                Plaintiff,

-against-

BUILDING SERVICE 32B-J PENSION FUND,
BUILDING SERVICE 32B-J HEALTH FUND,
and BUILDING SERVICE 32B-J BENEFIT
FUND,

                Defendants.

------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 05-CV-2328 (FB) (JO)

*Appearances*
*For the Plaintiff:*
IRA H. ZUCKERMAN, ESQ.
Law Offices of Max D. Leifer, P.C.
628 Broadway
Suite 300
New York, NY 10012

*For the Defendants:*
IRA A. STURM, ESQ.
Raab & Sturm, LLP
330 Madison Avenue - Suite 2010
7th Floor
New York, NY 10017

**BLOCK, Senior District Judge:**

        After being denied disability benefits by the defendants ("the Funds"), Bejaze Durakovic ("Durakovic") brought suit under the Employee Retirement Income Security Act ("ERISA") "to recover benefits due to [her] under the terms of [her] plan...." 29 U.S.C. § 1132(a)(1)(B). The parties have now made cross-motions for summary judgment. Durakovic has also moved in the alternative that, if she is not granted summary judgment, discovery be reopened. Because they are entitled to judgment as a matter of law, the Funds' motion is granted.

1

# I

The following facts are taken from the administrative record and are not disputed:

Durakovic was born in 1946 in Yugoslavia. Although she has lived in the United States for decades, she does not speak, read, or write English fluently. She worked as a building cleaner and was a member of the Building Services Employees Union, Local 32, for thirty-two years. In 2003, she applied for a disability pension from the Funds, citing chronic back pain and neck pain deriving from injuries sustained in a car accident in 1999. Her last day of work was June 16, 2003. In 2004, the Social Security Administration determined that she was disabled.

The Funds, which perform pension plan administration for Durakovic's union, were established pursuant to the Taft-Hartley Act, 29 U.S.C. § 186; they are administered by trustees who are representatives of the union and the management of participating employers; the trustees are not paid any compensation by the Funds for their service. The Pension Fund Plan provides that a participant is "totally and permanently disabled if on the basis of medical evidence satisfactory to the Trustees, he is . . . totally and permanently unable, as a result of bodily injury or disease, to engage in any further employment or gainful pursuit. The Trustees or their authorized delegate(s) shall determine whether the Participant is totally and permanently disabled . . . and the entitlement to a Disability Pension hereunder, in their sole and absolute discretion . . . ." Johnson Aff. Ex. D.

In support of her disability claim, Durakovic submitted medical records. These

included a report dated October 14, 2003, labeled "Initial Consultation," from Dr. Alan J. Dayan ("Dr. Dayan"), stating that Durakovic "has difficulty getting out of the chair, ascending and descending stairs, pain with any level of walking, and flexion of the knee. There is no significant difficulty putting on shoes or socks. There is no groin pain only minimal back pain and no buttock pain." Johnson Aff. Ex N. Dr. Dayan concluded that she suffered from "[r]ight knee internal derangement that has been long lasting in nature and continues to cause significant disability," and recommended an "operative intervention." *Id.* Durakovic had surgery on her right leg the following month, according to a record entitled "Ambulatory Surgery Post-Operative Instructions," although the record does not reveal the precise nature of the surgery.

Durakovic also submitted records from Dr. Leonard A. Langman ("Dr. Langman"), who began treating her in April of 2003. These records show that she suffers from cervical and lumbar radiculopathy causing back pain and spasms, as well as mild carpal tunnel syndrome. They included, *inter alia*, a form entitled "Disability Certificate"[1] from Dr. Langman conclusorily stating that Durakovic "is totally disabled and unable to perform any work duties." Johnson Aff. Ex. L.

The Funds sent Durakovic to Dr. Ludmilla Bronfin ("Dr. Bronfin"), a neurologist at New York University Medical Center, for an independent medical review. By letter to the Funds dated Feburary 2, 2004, Dr. Bronfin confirmed that Durakovic suffered

---

[1] The document is a one-page form produced by Dr. Langman's office and filled out by Dr. Langman; apparently he uses it to communicate patients' disability status to insurers and similar entities.

3

from cervical radiculopathy, spasms and chronic pain in her back, knee dysfunction, and mild carpal tunnel syndrome; she also found meralgia paraesthetica.[2] She concluded, however, that Durakovic "should not be deemed totally disabled and could attempt to work in a sedentary capacity." Johnson Aff. Ex. S. Attached to the letter was a report dated January 20, 2009, in which Dr. Bronfin stated that Durakovic could walk three or four blocks; that in an eight-hour work day she could sit for about eight hours, stand for about two hours (but could not walk for more than two hours); that she could lift ten pounds occasionally; and that she could twist and bend occasionally. Although the doctor noted that Durakovic could not work an eight-hour day on a sustained basis, she stated that Durakovic was "[n]ot totally disabled." *Id.* The Funds denied Durakovic's claim for disability pension benefits by letter dated March 5, 2004; the reason given was Dr. Bronfin's conclusion "that [Durakovic was] presently able to work in a sedentary capacity." Johnson Aff. Ex. T.

Durakovic appealed. Appeals are decided by an Appeals Committee that does not include any "person who participated in the initial benefit denial" and gives no deference to the Funds' initial decision. Johnson Aff. Ex D. (Plan Document at 26). Pursuant to the Funds' procedure, Durakovic was examined by a second independent medical examiner, Dr. Ira Rashbaum ("Dr. Rashbaum"), a professor at the New York University School of Medicine's Rusk Institute of Rehabilitation Medicine. As recounted in his report of September 20, 2004, Dr. Rashbaum found Durakovic to have "cervical strain, lumbar

---

[2] Meralgia paraesthetica (sometimes spelled "paresthetica") refers to "burning pain, tingling, [or itching] along the lateral aspect of the thigh . . . ." Stedman's Medical Dictionary (27th ed. 2000).

4

strain, cervical radiculopathy, cervical and lumbar herniated discs, cervical spinal stenosis, bilateral mild carpal tunnel syndrome and right knee sprain." Johnson Aff. Ex. X. Dr. Rashbaum concluded: "From a physical medicine and rehabilitation standpoint, she is not totally disabled and could attempt to return to work in a sedentary capacity." *Id.*

The Appeals Committee denied Durakovic's appeal by letter dated December 13, 2004; the Committee stated that it had considered all of the medical records that Durakovic had submitted, listing the individual records reviewed, as well as the determination of disability by the Social Security Administration. It quoted from Dr. Rashbaum's report that "from a physical medicine and rehabilitation standpoint, [Durakovic] is not totally disabled and could attempt to return to work in a sedentary capacity," and from that part of Dr. Bronfin's letter of February 2, 2004, similarly concluding that "the patient . . . should not be deemed totally disabled and could attempt to work in a sedentary capacity." Johnson Aff. Ex. CC. The Appeals Committee determined, based on this evidence, that Durakovic had not met the standard for disability, which requires that the claimant be "totally and permanently unable . . . to engage in *any* further employment or gainful pursuit." *Id.*

Durakovic initiated this litigation on May 13, 2005. The following year, the Second Circuit decided *Demirovic v. Building Service 32 B-J Pension Fund*, holding that, in addition to making medical assessments of a claimant's capacity to work, ERISA plan administrators must conduct an "assessment as to whether she has the vocational capacity to perform any type of work — of a type that actually exists in the national economy — that

permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." 467 F.3d 208, 215 (2d Cir. 2006).

Presumably in response to *Demirovic,* the Funds decided to reopen Durakovic's case, and retained Apex Rehab Management ("Apex") to conduct a vocational assessment. Apex rendered an "Employability Report," dated April 24, 2007, divided into sections entitled "Overview," Medical," "Education," "Work History" and "Alternative Occupations." Johnson Aff. Ex. FF (Apex report). In the Overview, Apex noted that Durakovic was a Cleaner and had been diagnosed with "cervical muscle spasms and cervical and lumbar radiculopathy," and that the medical history was provided by the Funds. No mention is made as to whether the Funds furnished Apex with the plaintiff's doctor's reports, and the only medical records identified and relied upon in the Medical section are those aspects of Dr. Bronfin's January 20, 2004 report regarding her findings as to plaintiff's capacities to sit, stand and walk, and Dr. Raushbaum's conclusion in his September 20, 2004 report that claimant could work in a sedentary capacity.

In the Education section, Apex recounted that Durakovic reported having poor English language skills and not being able to operate a computer and, after acknowledging, under Work History, that her job as a Cleaner was unskilled work, Apex concluded as follows:

> A transferable skills analysis was performed for this claimant. The analysis was consistent with the claimant's specific vocational development, general educational development and current functional abilities. The Transferable Skills Analysis was performed based on *sedentary* functional capacity. The Transferable Skills Analysis identified several occupations that

> this claimant has generally transferable skills and residual functional capabilities to perform. Limitations with English[ were] also taken into consideration. Occupations that are classified as "unskilled" by the Department of Labor were also considered for the Employability Report. The following occupations are examples that match this worker's profile and which exist in significant numbers in the regional labor market[: jewelry assembler, food checker, and button assembler].

*Id.* The report cited, under Alternative Occupations, the Dictionary of Occupational Titles for the three job examples and referenced the Dictionary's categorization of button assembler as unskilled labor and the other two occupations as semiskilled.[3]

Durakovic enlisted her own vocational expert, Lynn Mizzy Jonas ("Jonas"), who reviewed the medical records of both of Durakovic's doctors as well as the independent medical examiners hired by the Funds. Jonas also conducted tests on Durakovic designed to evaluate her manual dexterity and visual acuity; Durakovic's scores were in the lowest percentile range on most of the tests. Jonas concluded that Durakovic was "unable to perform any work." Johnson Aff. Ex. HH. Durakovic submitted Jonas's report to the Appeals Committee, along with a letter from Jonas criticizing the Apex report; Jonas argued that Apex should have conducted tests, should have reviewed all of Durakovic's medical records—not just those generated by the Funds' doctors, and should not have considered that Durakovic could perform semiskilled work in light of her history of only unskilled

---

[3] A Social Security Ruling discussing the determination that a job is semiskilled states: "Semiskilled occupations are more complex than unskilled work and distinctly simpler than the more highly skilled types of jobs.... Even though semiskilled occupations require more than 30 days to learn, the content of work activities in some semiskilled jobs may be little more than unskilled." S.S.R. 82-41.

7

work; Jonas also conclusorily took issue with Apex's blanket statement that the position of button assembler exists in the regional labor market in significant numbers.

The Appeals Committee then submitted the case to Apex for reconsideration. Apex issued a supplemental report, dated October 15, 2007, adhering to its original conclusion. Johnson Aff. Ex. KK. In a section marked "Review," Apex noted that it had received, as an updated medical, Dr. Bronfin's letter of February 2, 2004 — concluding that Duraovic was able to do sedentary work — which Apex added to the supplemental report's Medical section. In all other respects the supplemental report repeated verbatim the other sections of the prior report. Presumably Apex was, once again, not apprised of Durakovic's doctors' reports; nor is there any reference to receiving Jonas's report.

The appeal was finally denied by letter dated December 10, 2007. The letter stated that the determination was based on:

> Dr. Ira Rashbaum's Independent Medical Evaluation of September 20, 2004 wherein he states that [Durakovic is] able to work in a sedentary capacity; [Apex's] Employability Evaluation Report of October 15, 2007 wherein [it] states [she has] transferable skills and residual functional capabilities necessary to perform several occupations. In addition, the Committee reviewed the medical records [Durakovic] submitted, as well as the entire file.

Johnson Aff. Ex. NN.

II

A. The Standard of Review

ERISA authorizes "actions challenging denials of benefits..." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989) (citing 29 U.S.C. § 1132(a)); where a benefit plan

8

gives "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.* at 115, the court will review a denial of benefits using an arbitrary-and-capricious standard, *see Demirovic*, 467 F.3d at 211. "Under that standard, [the court] may overturn a denial of benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 212. The Funds have discretionary authority to determine eligibility for benefits and interpret provisions of the pension plan, *see id.* at 211 (holding, in a case with the same defendants and identical plan language, that the plan conferred discretionary authority on them); therefore, arbitrary-and-capricious review is appropriate.

"Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). There is no dispute as to material facts here, as disclosed in the administrative record. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[A] district court's review under the arbitrary and capricious standard is limited to the administrative record.").

## B. Conflict of Interest

Last year, the Supreme Court held that a conflict of interest on the part of an ERISA plan administrator is a factor that must be weighed by a court determining whether the denial of benefits was arbitrary and capricious. *See Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008). Such a conflict can be created by "the fact that a plan administrator both evaluates claims for benefits and pays benefits claims . . . ." *Id.* After *Glenn*, the Second

9

Circuit held that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate;" the arbitrary-and-capricious standard is still extant. *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). Since the Funds evaluate participants' benefit claims and pay benefits, there is a conflict of interest.

In *Glenn*, the Court explained how the "conflict" factor is to be assessed in the context of all other factors in a given case:

> [A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

128 S. Ct. at 2351. The Funds fit better in the latter category; the conflict here is of relatively little importance. There is no evidence that the Funds have a history of biased plan administration; a review of cases from the past ten years in which they were named as

defendants does not disclose any finding that the Funds were biased.[4]

There is also no evidence that the conflict affected the decision in Durakovic's case. The Funds' procedures, as reflected in this case, provide many safeguards against bias: The Funds hire independent medical and vocational examiners; the Appeals Committee is composed of different individuals than those who decided the initial denial and is required to send the claimant to a new medical examiner; and the Appeals Committee consists of equal numbers of representatives of the union and the employers, none of whom are paid by the Funds. Thus, the Court will consider the Funds' conflict of interest as a factor, albeit a relatively unimportant one — one that could tip the balance in Durakovic's favor only if the other factors are closely balanced.

## C. The Funds' Denial of Benefits Was Neither Arbitrary nor Capricious

Durakovic argues that the Funds' determination was arbitrary and capricious because (1) the independent medical examiners' conclusions that she was not disabled are incredible given her symptoms; (2) the medical examiners did not consider the Social Security Administration's determination ("SSA determination") that she was disabled; (3) Apex was not provided with her full medical record; (4) Apex did not consider whether the jobs it suggested she could perform existed in the national economy; and (5) Apex did not physically examine her. Thus, she proffers, in essence, three factors which she believes, in combination with the Funds' conflict of interest, compel the Court to conclude that the

---

[4] The Court conducted a Westlaw search for cases in which one or more of the Funds was a named party, which revealed seventeen decisions in which denials of benefits were challenged by claimants.

Fund's decision was arbitrary and capricious: (1) the nature of the medical reports; (2) the disability determination by the Social Security Administration; (3) the inadequacy of Apex's vocational assessment.

Although it is understandable that the plaintiff may have difficulty accepting that she can be found disabled by the SSA but not by the Funds, and although the Court has some misgivings about the quality and nature of Apex's vocational assessment, in the final analysis, given the broad discretion accorded to the Funds, the Court concludes that the vocational assessment passes legal muster, and that the Funds could principally rely on the report of its two doctors in rejecting Durakovic's disability claim.

### 1. The SSA Disability Determination

Although the SSA determination should be considered by the Funds, which it was, it is not *binding* on them. *See Pagan v. Nynex Pension Plan*, 846 F. Supp. 19, 21 (S.D.N.Y. 1994) ("Social Security determinations are . . . not binding on ERISA plans, and should not have unintended side effects on such plans not contemplated when the plans were initiated, or by Congress in creating the Social Security disability structure."). Notably, "because the Social Security Administration has a 'treating physician's rule,' and ERISA-governed private pension plans do not, it is not very surprising that a claimant could qualify for Social Security disability benefits, but in the plan administrator's discretion be denied private disability benefits on the same administrative record." *Suarato v. Bldg. Servs. 32BJ Pension Fund,* , 554 F. Supp. 2d, 399, 423 n.35 (S.D.N.Y. 2008). Contrary to Durakovic's contention, the SSA determination need not be placed before the Funds' medical examiners

for their consideration, which would be conceptually anathema to an independent medical review untarnished by an administrative agency's determination.

## 2. The Vocational Assessment

*Demirovic's* requirement that vocational assessments are a precondition to the denial of an ERISA disability claim should not be taken lightly in view of the circuit court's admonition that the assessment, in addition to ascertaining that the work that a claimant can perform must not only be "of a type that actually exists in the national economy," must also "permit her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." 467 F.3d at 215. It is not at all certain that Apex had this standard in mind when it simply referenced the Dictionary of Occupational Titles in concluding that the jobs of jewelry assembler, food checker, and button assembler "match the worker's profile" and "exist in significant numbers in the regional labor market." Johnson Aff. Ex. KK. This is particularly troublesome since only button assembler is listed in the Dictionary as unskilled labor; the others being semi-skilled and arguably beyond the capacity of a building cleaner with apparently little command of the English language.[5] And how many button assembler positions actually exist in the regional or national economy is a matter of pure conjecture.

Troublesome also is the nature of Apex's reconsideration. While it is admirable

---

[5] The SSA has explained that "semiskilled occupations require more than 30 days to learn," and that although "the content of work activities in some semiskilled jobs may be little more than unskilled," nonetheless, "[s]emiskilled occupations are more complex than unskilled work." S.S.R. 82-41.

13

that the Funds would seek reconsideration in light of the contrary conclusions drawn by Durokovic's vocational expert, it is puzzling why, apparently, they did not make Jonas' report available to Apex or, once again, the plaintiff's medical records, choosing instead to only submit Dr. Bronfin's lettter.

Although the Court issues a caveat that in light of *Demirovic*, ERISA plan administrators should guard against perfunctory, conclusory vocational assessments, it will not here reverse the Funds' denial of plaintiff's disability claim despite its concerns about the nature and quality of the vocational assessment: Principally, Apex's assessment contained an accurate overview of the onset of Durakovic's disability, noting that she worked as a cleaner, and disclosed that it had reviewed both of the Funds' medical examiners' reports explaining Durakovic's physical maladies and limitations; it also stated that it performed a "transferable skills analysis" based on sedentary factional capacity, which took into consideration Durokovic's English language limitations and the Dictionary of Occupational Titles.

Notably, the court in *Demirovic*, while making ERISA vocational assessments the order of the day, was careful to make clear that it was not undermining the broad discretion that still reposed with ERISA plan administrators, explaining that where, as in the present case, "the plan is silent on the issue of non-medical vocational characteristics, the nature of this consideration will be within the plan administrators' broad discretion." 467 F.3d at 215. And in discussing the types of vocational assessments that plan administrators could embrace within their broad, discretionary power, it gave its approbation to

14

transferable skills analyses using a claimant's "education and former work experience to find occupations . . . that involved skills that [he] could transfer from his previous jobs." *Id.*, (citing and quoting *Buchanan v. Reliance Std. Life Insu. Co.*, 5 F. Supp. 2d 1172, 1185 (D. Kan. 1998) (upholding denial of benefits where the parties' vocational experts, as here, disagreed as to claimant's ability to work)). Notably, *Buchanan* is markedly similar to the present case: defendant conducted a transferable skills analysis that took into account the plaintiff's "work history, current physical capacities, worker profile and transferable skills"; the analysis was based on a review of the plaintiff's records, rather than an examination of the plaintiff; and the resulting report identified jobs from the Dictionary of Occupational Titles that the plaintiff could perform. 5 F. Supp. 2d at 1176-77. The Court also notes that the Southern District recently found a vocational review conducted by Apex for the Funds that was comparable to that conducted in the present case to comply with the requirements of *Demirovic*. See *Suarato*, 554 F. Supp. 2d at 422-23.

Therefore, although the reliability of the Apex's vocational assessment might have benefitted if Apex had considered all of the medical records, rather than apparently being limited to the Funds' medical examiners' reports, had considered the plaintiff's vocational expert's report, and had included a more detailed analysis of the jobs that plaintiff's vocational capacities would enable her to perform, the court cannot say that it was legally inadequate.

### 3. The Medical Records

In the final analysis, the Funds were entitled to rely upon the reports of their

15

medical examiners, who were highly credentialed; they collectively gave detailed and accurate accounts of Durokovic's medical conditions and assessed her physical capacities, and their opinions that Durokovic was capable of performing sedentary work are consistent with their findings. This medical evidence, which the Funds were entitled to rely upon, in tandem with the vocational assessment (notwithstanding the court's misgivings), clearly outweighs the marginal nature of the administrators' conflict of interest and requires the Court to give deference to the broad discretion accorded to the Funds' rejection of the plaintiff's disability claim. *See Demirovic*, 467 F.3d at 212 ("[A] plan need not accord the insured's treating physician greater deference than a plan's retained physician."); *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").[6]

---

[6] The Court is aware that there are a handful of decisions finding denials of benefits by the Funds to be arbitrary and capricious because they did not adequately explain their reasons, which is not the case here. For example, in *Brown v. Board of Trustees of Bld. Servs. 32B-J Pension Fund*, 392 F. Supp. 2d 434 (E.D.N.Y. 2005), the Funds' denial letter merely noted that all of the "file records . . . were considered" and conclusorily stated that the claimant was "not Totally Disabled when [he] last worked in covered employment," quoting the plan's definition of "disabled." 392 F. Supp. 2d at 441; *see also Dzidzovic v. Bldg. Serv. 32B-J Health Fund*, No. 02 CV 6140, 2006 WL 2266501, at *11 (S.D.N.Y. Aug. 7, 2006) ("The [denial] letters merely state that plaintiff's medical condition did not meet the plan's criteria for 'totally disabled' and quoted the plan's definition of that term. Basically, no reasons were given."); *Giraldo v. Bldg. Serv. 32B-J Pension Fund*, No. 04-CV-3595, 2006 WL 380455, at *4 (S.D.N.Y. Feb. 16, 2006) (finding arbitrary and capricious denial based on doctor's one-sentence conclusion that claimant was capable of sedentary work when the record did not reveal plaintiff's former position or what types of sedentary work she could do); *Nerys v. Bldg. Serv. 32B-J Health Fund*, No. 03 Civ. 0093, 2004 WL 2210256 (S.D.N.Y. Sept. 30, 2004) (holding denial of benefits arbitrary and capricious when denial letters did not state reasons for denial).

## D. Durakovic's Motion to Reopen Discovery

Attempting to show that the Funds' conflict of interest affected the denial of her benefits claim, Durakovic moves in the alternative to reopen discovery in the hopes of ascertaining: (1) the ratio of applications for disability benefits to the number that were granted; (2) the list of medical and vocational examiners used by the Funds, how many claims are referred to each, and how many claimants are found not to be disabled; and (3) the Funds' policies regarding the information provided to medical and vocational examiners and other aspects of the processing of disability claims.

On January 16, 2008, two-and-a-half years after Durakovic filed her Complaint, the magistrate judge ordered her to submit a letter as to whether the parties sought further discovery. Durakovic's letter in response stated: "Based upon the documentation provided to us by the defendant, we do not believe that further discovery is necessary." Pl.'s Letter dated Jan. 29, 2008, Docket Entry #26. Discovery was closed on January 30, 2008.

"A party seeking to reopen discovery bears the burden of establishing good cause and discovery should not be extended when there was ample opportunity to pursue the evidence during discovery." *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. CV 05-776, 2008 WL 4415263, at *3 (E.D.N.Y. Sept. 24, 2008). When deciding a summary judgment motion, "the trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989).

Durakovic offers no reason why she could not have engaged in the discovery she now seeks before the close of discovery — indeed, discovery was closed because of her representation that further discovery was not necessary. The facts that form the basis for Durakovic's argument that the Funds are conflicted are in the administrative record; no new evidence has come to light justifying a further investigation into the issue. Nor has a change in the law afforded Durakovic a new theory to advance: while *Glenn* clarified the circumstances that cause plan administrators to be conflicted and elucidated "how any such conflict should be taken into account on judicial review," 128 S. Ct. at 2347, the proposition that a plan administrator's conflict of interest is relevant to judicial review of an ERISA benefits determination has long been recognized. *See Firestone*, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" (quoting Restatement (Second) of Trusts § 187) (alteration in *Firestone*)). Thus, Durakovic has not shown that good cause exists to reopen discovery.

### III

Durakovic's motion is denied. The Funds' motion for summary judgment is granted; the Amended Complaint is dismissed.

**SO ORDERED.**

                                                               S/FB
                                           FREDERIC BLOCK
Brooklyn, New York             Senior United States District Judge
July 29, 2009